## Commonwealth v. Wilson

*Ruth Forsht* and *A. J. Rosenbleet*, for Commonwealth.

*Leonard Boreman*, for defendant.

McDONALD, J., August 25, 1941.—In this case defendant, Harry Wilson, was arrested and convicted before a justice of the peace upon a charge that he

violated the Act of May 13, 1909, P. L. 520, as amended, commonly known as the General Food Law, the specific charge being that defendant did, on March 4, 1941, offer and expose for sale and have in his possession and did then sell to one Earl A. Oesterling a certain article of food, to wit, wine-cured pickles, which upon analysis were alleged to have contained little or no wine therein. It is accordingly alleged that such article of food was misbranded and adulterated.

Having been so convicted of the violation of said act of assembly, defendant, who is the manager of a certain grocery store where said alleged wine-cured pickles were sold, appealed to this court and the appeal was allowed. The appeal having been so allowed, defendant filed a petition and obtained a rule of this court upon the Commonwealth to show cause why the Commonwealth should not turn over to defendant or his attorney a portion of the pickles so purchased from defendant in order that defendant might have a chemical analysis thereof for the purpose of preparing a proper defense in his behalf at the time of the trial of the case in this court. To this petition and rule the Commonwealth filed an answer and, from the petition and answer and the agreed statement of facts as set forth at the oral argument of this case, we learn that defendant was, on March 4, 1941, the manager of a certain chain grocery store in the City of Pittsburgh; that he did on that date sell a jar of dill pickles labeled "wine-cured pickles" to one Earl A. Oesterling, who was an agent of the Commonwealth of Pennsylvania; that said Earl A. Oesterling turned the said pickles over to one Clyde H. Campbell, a registered chemist, for analysis. Upon making such analysis, said Clyde H. Campbell found that the said jar of pickles contained little or no wine content. Although said pickles were purchased on March 4, 1941, the prosecution in this case was not instituted until 24 days thereafter, to wit, on March 28, 1941, and it is admitted by the Commonwealth that, unless the pickles were kept in a certain condition dur-

ing this 24-day period, the chemical contents of the jar of pickles might possibly alter or change in that length of time.

Hearing in this case was held before the justice of the peace on April 28, 1941, and at that hearing before the justice of the peace defendant demanded that a portion of said pickles be delivered to him for chemical analysis. Such demand was refused, and in its answer to the rule in this case the Commonwealth avers that the pickles were a perishable product and that the Commonwealth had destroyed the jar of said pickles after it had completed its analysis by Mr. Campbell, as aforesaid. The Commonwealth avers that there are now no pickles available for analysis.

Defendant in this case relies upon the decision of this court in the case of Commonwealth v. Glass, at no. C-1484 of 1939, and upon the case of Commonwealth v. Scherr, at no. 142 of 1940. In those cases the agent of the Commonwealth had arrested defendants and defendants had been convicted before a magistrate or a justice of the peace upon charges that they violated the General Food Law, in that they possessed and exposed for sale certain noodles which did not have a sufficient content of egg solids or which were alleged to contain artificial coloring matter. In those cases defendants filed petitions and the court made an order directing that a portion of said noodles be delivered to an officer of this court to be independently analyzed in the presence of an officer of this court and in the presence of representatives of the Commonwealth. In those cases after the order of court had been made directing that a portion of said noodles be delivered and independently analyzed as aforesaid, the Commonwealth did not choose to rely upon the analysis of its chemist and upon which defendants had been convicted before a magistrate or justice of the peace, but sent the said noodles still in its possession to the department in Harrisburg for further analysis, and then after that analysis had been made in Harrisburg it sent the remaining portion

of said noodles for still a third analysis to be made by certain chemists in Philadelphia. After these three analyses had been made by the Commonwealth in order to support the conviction of defendants in those cases, there were not sufficient noodles remaining to make another analysis by an independent chemist, as contemplated by the order of court in those cases.

We frankly admit that we were somewhat provoked by the actions of the Commonwealth in that case and we seriously considered contempt proceedings against the persons who had so flouted the order of court. However, we, in those cases, contented ourselves with a dismissal of the proceedings against defendants and with finding defendants not guilty.

After that action was taken by this court in the cases above referred to, we were further provoked when, after the proceedings had been dismissed, as aforesaid, and the matters were closed, we were informed by the attorney for the Commonwealth in those cases that this court never again would have the opportunity to make such an order because, as was then frankly stated to the author of this opinion, the Commonwealth would see to it that never thereafter would there be any portion of the alleged adulterated or misbranded food remaining for any analysis by any person.

Accordingly, when this case came before us for argument, we naturally and immediately supposed that in this case the Commonwealth was doing just exactly what the Commonwealth's then attorney told us would be done in future food cases in this court, to wit, that they would destroy any portion of the alleged misbranded or adulterated foods so that no further analysis could be made thereof. We were, therefore, tempted to immediately dismiss the proceedings in this case. However, we are compelled to bear in mind that our first duty is to protect the public against misbranded or adulterated foods. It is equally our duty to protect the public against improper prosecution for allegedly

possessing or selling or offering for sale misbranded or adulterated foods.

This case differs from the noodles cases above referred to in that in the noodles cases the Commonwealth admitted that it had possession of a sufficient quantity of the noodles which could have been independently analyzed at the time the order of the court was made, while in the instant case the Commonwealth avers that it has no portion of the pickles in its possession. It further differs in that in the noodles cases the food product was not a perishable product, and we can readily see how a jar of pickles would be a perishable product which the Commonwealth could properly destroy after it had made its analysis thereof.

In the noodles cases above referred to, we said:

"At the time of trial of defendant his innocence or guilt will depend entirely upon an analysis of the noodles, and such analysis can be made only with special laboratory equipment. Such analysis cannot be made in a court room and if it could be so made, it would not be permitted to turn the court room into a laboratory for the purposes of this case. Doubtless such analysis has been made by chemists for the Commonwealth and doubtless such analysis has shown to the satisfaction of such chemists that the defendant is guilty of the offense charged. If such analysis is accepted as true at the time of the trial the defendant must be convicted, and we can see no practical way in which defendant may defend himself unless he be given an opportunity to chemically analyze the very noodles in question. An analysis of other noodles would not suffice as such analysis would not be received in evidence, and testimony as to the ingredients which entered into a batch of noodles of which these particular noodles are a part would not be very persuasive even if it were found possible to trace these noodles to the batch of which they are a part."

We do not recede from the position we took in the noodles cases. However, we feel that in these food cases,

where the article of food purchased is of a perishable nature, each case must stand upon its own facts. Hence, we say that when this case is called for trial, if the trial judge is satisfied that the Commonwealth has improperly destroyed the pickles in this case so as to prevent an independent analysis thereof, or if the Commonwealth has unnecessarily delayed prosecution in this case for the purpose of making such independent analysis impossible or impractical, these matters will weigh heavily against the Commonwealth and in favor of defendant at the trial of the case. In other words, this court intends to protect the public against misbranded or adulterated foods, and at the same time we intend to protect merchants against improper prosecution at the hands of the Commonwealth. Each case must stand or fall upon its own facts.

In the instant case we do not believe that the Commonwealth's agents have been as alert to see that justice was done as they were to see that a conviction was obtained before a magistrate. However, we feel that this is a matter which should be decided by a trial judge after all the facts are before that trial judge in a regular and proper proceeding.

At this time, therefore, the rule heretofore granted in this case will be discharged and the case will be listed for trial de novo.